**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 04-20850-CIV-TORRES

CONSENT CASE

**GULF GROUP HOLDINGS, INC.**, a Florida
corporation,

      Plaintiff,

vs.

**COAST ASSET MANAGEMENT
CORPORATION**, a Delaware corporation;
**THE COAST FUND, L.P.**, a Cayman Islands
limited company; **COAST ARBITRAGE
FUND, LTD**., a Cayman Islands limited
company; **DES CAPITAL LLC**, a Delaware
corporation; **DAVID SMITH**, an individual;
**CHRISTOPHER PETITT**, an individual;
**COAST ASSET MANAGEMENT, LLC**, a
Delaware limited liability company; and
**COAST ASSET MANAGEMENT, LP**, a
Delaware limited partnership,

      Defendants.

_____/

**ORDER ON GULF GROUP'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiff/Counter-Defendant's Motion for

Summary Judgment [D.E. 384].  The Court held a hearing in connection with this motion

on January 18, 2007.  After reviewing the papers filed in this case and listening to

argument of counsel, the Court will **GRANT IN PART AND DENY IN PART** the Motion for

Summary Judgment.

# I.   BACKGROUND

On February 19, 1998, Gulf Group and Coast entered into a contract entitled "Tax Certificate Acquisition and Service Agreement," under which Gulf was retained to acquire municipal tax lien certificates at public auctions throughout the State of Florida for and on behalf of Coast – a hedge fund based in California.  Under the contract, Coast also agreed to use Gulf Group to service and administer all the tax certificates acquired by Gulf Group.  The pertinent provisions of the parties' agreement are the following:

. . .

3.      Purchase of Tax Certificates. . . .
    (d)     Selection of Tax Certificates.  GGH will use its own criteria, experience, and strategy to select the Tax Certificates to purchase.  Coast shall be entitled to monitor the acquisition process.
    (e)     Bidding.  Coast authorizes GGH to use GGH's discretion to determine the interest rates to bid for Tax Certificates.  The parties acknowledge and agree that the interest rate bid at auction will be a function of variables that will include, but are not limited to, GGH's profiles, historical redemption patterns, and competing bidders at a given time.

. . .

4.      Tax Deed Applications.  Coast agrees to utilize the services of GGH for all tax deed applications made on Tax Certificates purchased by GGH on behalf of Coast that have not been redeemed. . . . GGH shall initiate the procedure to apply for tax deed as soon as it is permitted to do so under Chapter 197.  GGH shall notify Coast of the amount necessary to apply for tax deed on a Tax Certificate [] and the date on which the funds are required []. . . .

5.      Servicing of Tax Certificate Portfolio.  Coast shall utilize GGH to service the portfolio of Tax Certificates purchased.  GGH shall retain, at its expense, and coordinate the services of attorneys in the event there are problems with any Tax Certificates or tax deed applications.  GGH shall endeavor in good faith to satisfy the requirements established by Standard and Poor's to be rated as a servicer.

6.      Fees to GGH.  Coast agrees to pay GGH the following fees in consideration for its services:
    (a)     Tax Certificate Acquisition Fee.  On May 1 of every year of this Agreement, Coast shall pay GGH $700,000 []. . . .

. . .

    (c)     Servicing Fee.  Coast shall pay GGH a monthly fee of $15,000 per Fund Year [] for servicing the portfolio [], which shall be due and payable on the first of every month commencing June 1, 1998.

. . .

> (d)     Performance Bonus.  If a Fund Year's IRR [] exceeds 12.000%
> (the "Threshold IRR"), Coast shall pay GGH a performance bonus equal to
> 50% of profits on a Fund Year's portfolio in excess of the Threshold IRR [].

*See* Service Agreement, D.E. 1, Ex. A.

Gulf Group initiated this action claiming that Coast breached the contract by failing to pay the performance bonus Coast owed Gulf Group under the parties' agreement.  Gulf Group also alleged that Coast breached the agreement by transferring the servicing of the tax lien portfolios to another entity and depriving Gulf Group of the ability to ensure the profitability of the portfolios.

In response to Gulf Group's complaint, through it First Counterclaim and its Third, Fourth, Fifth, Sixth, Seventh and Eighth Affirmative Defenses, Coast asserts that Gulf Group materially breached the parties' agreement.  *See* D.E. 214 ¶¶ 198-219, 292-97.  Coast seeks both damages and a set-off against any damages to which Gulf may be entitled pursuant to its own claims.  *Id.*  Coast also asserts that Gulf is precluded from recovering any damages from Coast.  *Id.*

Coast specifically claims that Gulf Group breached the agreement by investing in low quality and high risk tax liens, tax deed applications, and real estate owned.  It also claims that Gulf Group breached the agreement by failing to timely file tax deed applications, failing to collect redemption proceeds for partially-redeemed tax liens, failing to timely pay property taxes assessed on real estate owned properties, and failing to provide Coast with timely and accurate reports.

Additionally, in its Fourth Counterclaim, Coast alleges that as a result of Gulf Group's illegal conduct during the 1998 Lee County Auction, Coast was required to settle the action commenced by the Florida State Attorney General for $150,000, and to incur various expenses, including attorneys' fees.  *See* D.E. 214 ¶¶ 158-162.  Coast seeks

indemnification from Gulf Group for the amount it paid to settle the action and for all expenses incurred in connection therewith.  *Id.*

This indemnification claim is based upon the allegation that in June 1998, Gulf Group engaged in anti-competitive bidding at the Lee County auction.  According to Coast, two of Gulf Group's bidders colluded with other bidders at the auction to keep the bidding on the tax lien certificates at 18%.  Later that same year, the Florida State Attorney General began an investigation and on November 20, 1998, Politano, Gulf Group's principal, received a Civil Investigative Demand.  Then on May 22, 2002, the Florida Attorney General commenced an action against Gulf Group, Coast and Saul & Co.[1]  The Attorney General alleged that certain bidders at the 1998 Lee County auction had engaged in an illegal conspiracy to fix the interest rates on the tax liens sold during the auction by not bidding against each other and that this conduct artificially inflated those interest rates.  Coast and Saul were named as defendants solely on the basis of their vicarious liability for the acts of Gulf Group, which acted as Coast and Saul's buyer.

In connection with this lawsuit, the Attorney General issued a press release specifically identifying Coast as a defendant charged with rigging bids.  As a result, news articles regarding the lawsuit were published.  Coast received phone calls from its investors and Merrill Lynch seeking explanations regarding Coast's conduct in Florida.  Coast claims that this publicity placed Coast in a competitive disadvantage with respect to its efforts to attract new investors in its funds and thus hurt business development.

On August 12, 2002, Coast entered into a settlement agreement with the Florida Attorney General.  The Attorney General dismissed the action against Coast and Saul, and

---

[1]       Saul was the buying entity used by Coast to acquire liens in accordance with the secured financing agreement between Coast and Merrill Lynch.  Haveles Aff., Ex. 20 at 39.

Coast paid $150,000.  Unlike all the other defendants, Coast did not agree to a consent decree enjoining it from violating state and federal antitrust laws.  In December 2002, Gulf also settled the action with the Attorney General, but for only $25,000.  Gulf did agree to a consent decree enjoining it from further violations of antitrust laws.

Finally, Coast's Fifth Counterclaim states a cause of action for injury to reputation related to the publicity surrounding Coast's involvement in the alleged anti-competitive conduct at the 1998 Lee County auction.  Coast asserts that as a result of Gulf's illegal conduct, Coast's reputation was injured and its ability to attract new investors was impaired.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the court must view all the evidence and make all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005).  A material fact is one that might affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999).  Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiff, there is evidence on which the trier of fact could

reasonably find a verdict in their favor. *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225.

### III.   ANALYSIS

### A.   *First Counterclaim - Breach of Contract*

In its first counterclaim, Coast seeks damages for Gulf Group's alleged failure to purchase tax lien certificates in accordance with the terms of the parties' Servicing Agreement.   Gulf Group argues that the agreement vests it with sole discretion to determine which liens to acquire and the interest rates at which to acquire them.   Gulf Group further contends that its motion for summary judgment should be granted on this count because Coast cannot prove that it has suffered any damages based on the overall performance of each fund year's portfolio.   Gulf Group relies on the fundamental proposition that a claimant cannot recover for breach of contract under Florida law when it has not suffered damages.

The operative provision of the parties' agreement governing the purchase of tax lien certificates is contained in paragraph 3(d) entitled "Selection of Tax Certificates." It reads: "GGH will use its own criteria, experience, and strategy to select the Tax Certificates to purchase.  Coast shall be entitled to monitor the acquisition process."  Coast argues that because the word "discretion" does not appear in that provision, but does appear in section 3(e) of the agreement, the Court should refuse to read that term into section 3(d). Coast argues that the it is a "fundamental principle of contract construction [] that the expression of one thing is the exclusion of the other."  *Sprint Corp. v. Telimagine, Inc.*, 923 So. 2d 525, 527 (Fla. 2d DCA 2005).  Hence, if paragraph 3(d) does not provide Gulf Group with discretion then Coast believes it can seek damages for Gulf Group's breach of that provision whether or not Coast profited overall from its tax lien portfolio.  Coast's damage claim, in that event, would be based upon losses in value that individual

investments within the portfolio suffered due to Gulf Group's alleged failure to follow agreed-upon investment parameters.

We find, however, that section 3(d) of the agreement contractually confers upon Gulf Group ample discretion to determine which liens to acquire on Coast's behalf.  The problem with Coast's argument is that the parties' agreement expressly vests Gulf Group with discretion in the purchase of the tax lien certificates whether or not the term "discretion" is included within paragraph 3(d).  The fact that Gulf Group is granted the right under the contract to use "its own criteria, experience, and strategy" connotes the very type of investment discretion that Coast believes is missing from paragraph 3(d).  Even if the service agreement placed contractual parameters on Gulf, such as the amounts of tax certificates to be collected, it does "not indicate a right to control mode of performance, rather it relates to the substance of the work contracted to be performed." *Lee v. Am. Family Life Assurance Co. of Columbus*, 431 So. 2d 249, 251 (Fla. 1st DCA 1983).  Accordingly, Gulf Group could not have breached the parties' agreement simply by picking a few unprofitable investments in a portfolio of thousands of tax lien certificates, at least where the portfolio as a whole did not suffer losses.

Significantly, the parties' agreement provides that Gulf Group will receive a performance bonus based on the overall performance of each fund year's portfolio: "If a Fund Year's IRR [internal rate of return] exceeds 12.000% (the "Threshold IRR"), Coast shall pay GGH a performance bonus equal to 50% of profits on a Fund Year's portfolio in excess of the Threshold IRR (the "Performance Bonus")."  Gulf Group contends that, if the performance bonus was measured according to the overall profitability of the portfolio, then the parties contemplated that the success of Coast's investment would be measured based on the portfolio's overall profitability and not on the gains or losses on individual liens.  We agree.  Coast's breach of contract claim focuses on individual tax lien

certificates, which Coast alleges have sustained losses.  The Court finds that the performance of the overall portfolio must, as a matter of law, be the proper measure of Gulf Group's contractual liability.

The most analogous cases addressing why it is inappropriate to assess individual investments, rather than measuring the overall return of an investment portfolio, are those involving securities.  Such cases generally recognize that "[w]hen investment advisors make decisions, they do not view individual investments in isolation." *Leigh v. Engle*, 858 F.2d 361, 368 (7th Cir. 1988).  "[T]he goal is to create a diversified portfolio that balances appropriate levels of risk and return for the investor." *Id.*  The modern trend of law in this area establishes that courts should look at the profitability of the whole portfolio to determine the success of the investment since investors "are concerned with the end result . . ., not with the return on a single element in the portfolio . . . ." *Id.*

Here, because Gulf Group had discretion to decide which tax lien certificates to bid on, it could, without breaching the parties' agreement, compile a diversified portfolio to maximize the return on Coast's investment.  Such an approach to investing is widely utilized and recommended by investment advisors.  Further support for this conclusion can be found in *Central Nat'l Bank  of Mattoon v. U.S. Dep't of Treasury*, 912 F.2d 897, 901-02 (7th Cir. 1990), where Judge Posner explained that the suitability of an investment is not determined by the investment alone, but by how the investment, as part of a diversified portfolio, contributes to maximizing return without altering the client's overarching risk preference.  *See generally* Nauzer Balsara, *Trust Your Broker?: Suitability, Modern Portfolio Theory, and Expert Witnesses,* 17 St. Thomas L. Rev. 173, 176 (2004).

Gulf Group rightly points out that Coast is not complaining about the other high risk liens that Gulf Group invested in on Coast's behalf that were profitable.  Coast cannot, after profiting from the diversified portfolio that Gulf Group compiled on its

behalf, sue Gulf Group for damages because there were a few liens that caused it to lose money on those particular investments.  At least not where the overall portfolio did not suffer a material loss.  *See Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors*, 173 F.3d 313, 322 (5th Cir. 1999) (precluding recovery where district court erroneously judged investment in isolation rather than under the modern portfolio theory).

Therefore, under Florida law Gulf Group is entitled to summary judgment because, without damages, Coast cannot maintain its claim for breach of contract based on the losses caused by individual tax lien certificates.  *See, e.g., Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So. 2d 564, 565 (Fla 4th DCA 1993) (failure to show basis for damages precludes judgment for breach of contract as a matter of law); *Prestige Dev. Group, Inc. v. Russell*, 612 So. 2d 691, 692 (Fla. 1st DCA 1993) (same); *Money Mgmt Serv., Inc. v. Porraro*, No. 05-12859, 2005 WL 3487574, at * 1 (11th Cir. Dec. 21, 2005) (same).  There is no factual dispute on this point, as Coast concedes that the overall portfolio earned at least $28 million.  Aff. Peter Haveles, Ex. 171 (Ex. A at p.2).

Nevertheless, the Court's finding that Coast is precluded from asserting this breach of contract claim under Florida law (which indisputably governs this contract) does not resolve the First Counterclaim in its entirety.  To the extent that the breach of contract claim concerns purely the servicing aspects of the agreement, judgment cannot be summarily entered against Coast.  The Court finds that there is a genuine issue of fact regarding whether or not Gulf Group breached paragraphs 4 and 5 of the parties' agreement.  Had these servicing provisions of the agreement been part of the purchasing provisions, the result may have been different.  The agreement, however, shows that the purchasing of the liens and the servicing of them were considered separate parts of the parties' overall investment relationship.

The fee structure of the agreement makes this clear.  For example, paragraph 6(c) titled "Servicing Fee" states: "Coast shall pay GGH a monthly fee of $15,000 per Fund Year (as defined in Section 7) for servicing the portfolio (the "Monthly Servicing Fee"), which shall be due and payable on the first of every month commencing June 1, 1998." In contrast, paragraph 6(a) titled "Tax Certificate Acquisition Fee" states that Gulf Group will be paid $700,000 per year for its services in purchasing the liens.  Coast paid for the servicing of the portfolios separately from the compiling of the portfolios, leading the Court to conclude, at least for summary judgment purposes, that each was meant to be treated separately.

Furthermore, the agreement does not give Gulf Group unfettered discretion with respect to paragraphs 4 and 5.  Paragraph 4, for instance, provides:  "GGH shall initiate the procedure to apply for tax deed as soon as it is permitted to do so under Chapter 197."  That language is not the type of discretionary language that can be found in paragraph 3.  By its terms, paragraph 4 arguably requires that Gulf Group apply for a tax deed immediately, and the failure to do so could be found to be a breach of the agreement. And because this alleged contractual breach is a specific claim of nonperformance, rather than a broad-brushed discontent with the discretionary decisions of an investment manager, Coast's damage theory is not constrained by the portfolio measure of damages that was discussed above.  Arguably, Coast may be able to obtain specific damages for a claim that particular tax deed applications were not properly pursued as required by the agreement.

Gulf Group responds to this argument by contending that it attempted to file tax deed applications as soon as they became due, but that certain counties did not accept the applications immediately.  This explanation as to why the tax deed applications were not filed immediately is reasonable, but they also show that this issue is one for the trier

of fact.  The Court could not find as a matter of law that the counties did not accept Gulf Group's tax deed applications at issue.  Accordingly, summary judgment will be denied with respect to the breach of contract claim to the extent it concerns paragraphs 4 and 5 of the parties' agreement.[2]

Based upon the same arguments, Gulf Group has also moved for summary judgment on Coast's third and fourth affirmative defenses raised in answer to Gulf Group's breach of contract claim.  Therefore, judgment will only be entered against Coast to the extent that those affirmative defenses rely on Gulf Group's performance of its contractual obligations under paragraph 3(d) of the parties' agreement.  The Court notes that Coast's third and fourth affirmative defenses mostly concern Gulf Group's performance under paragraphs 4 and 5.  As to Coast's seventh and eighth affirmative defenses, which Gulf Group also challenges, judgment will not be entered against Coast as those affirmative defenses only concern Gulf Group's performance under paragraphs 4 and 5.

### B.    *Fourth Counterclaim - Indemnification*

In its fourth counterclaim, Coast seeks common law indemnification from Gulf Group for the amount Coast paid to settle the action commenced by the Florida Attorney General resulting from Gulf Group's alleged illegal conduct related to the 1998 Lee County Auction.  Gulf Group contends that its motion for summary judgment should be granted on this count because Coast settled that action without giving Gulf Group the opportunity to either approve the settlement or defend Coast in that case, which requires Coast to

---

[2]    We recognize that the damages available to Coast on this limited breach of contract counterclaim may be insignificant in comparison to Gulf Group's complaint that seeks $30 million in damages.  There is a natural compulsion to eliminate such a small-scale claim from this trial and focus instead on the bigger picture painted by Gulf Group's claim.  That compulsion, however, is not a legal basis to grant summary judgment against Coast when the record and the law does not support it.

prove Gulf Group's actual liability for that alleged conduct.   And because it must show

actual liability, while Coast pled that the illegal conduct occurred during only the first

three days of the auction, Coast cannot establish any set of facts under which Gulf Group

can be actually liable for that conduct.  Finally, Gulf Group also argues that Coast signed

an indemnification agreement in favor of Gulf Group in February 2002, thereby releasing

Gulf Group from all liability for any conduct up to that point unless such conduct was

"intentionally concealed," which Gulf Group maintains it was not.

### 1.   Applicable Burden on Coast as Indemnitor

Under Florida law, "[a]n indemnitor, to become bound by a settlement agreement

in a suit against the indemnitee, must have (1) notice of the claim, and (2) an opportunity

to appear and defend the claim."  If the indemnitor is not given notice or an opportunity

to defend, then the indemnitee must prove actual liability and that the settlement was

reasonable to bind the indemnitor to the settlement agreement.  *See Atlantic Coast Dev.*

*Corp. v. Napoleon Steel Contractors, Inc.*, 385 So. 2d 676, 680-81 (Fla. 3d DCA 1980)("a

showing [of reasonableness] is only required when a settlement has been entered into

without notice or the indemnitor has not had an opportunity to defend."); *GAB Bus. Serv.,*

*Inc. v. Syndicate*, 809 F.2d 755, 760 (11th Cir. 1987)(". . . when the indemnitee has not

given the indemnitor an opportunity to review, pass upon, or participate in the settlement,

due process and 'equitable indemnity principles' compel a demonstration of actual as

opposed to potential liability.").

Coast challenges Gulf Group's assertion that Coast settled the Florida Attorney

General action without giving Gulf Group notice or affording it an opportunity to defend

the claim.  The undisputed evidence in the record shows, however, that Gulf Group was

not given notice of Coast's settlement with the Florida Attorney General.   In his

deposition, Christopher Petitt, Coast's Chief Operating Officer, admitted that Coast settled

the Florida Attorney General action without any prior notice to Gulf Group.  (Petitt Dep. 141: 16-19).  As Coast did not give Gulf Group notice of the settlement, it must prove actual liability and the reasonableness of the settlement to bind Gulf Group to the settlement.  The Court finds, therefore, that Coast must prove actual liability and the reasonableness of the settlement before it may obtain indemnification in this case.

### 2.  *Procedural Argument as to Scope of Claim Alleged in Counterclaim*

Because Gulf Group correctly states that Coast must prove Gulf Group's actual liability in connection with the indemnification claim, Gulf Group then concludes that it cannot do so in this case because of the specific wording of the counterclaim. Specifically, Gulf Group points out that the counterclaim alleges that the illegal conduct at issue in the case took place during the "first three days" of the 1998 Lee County auction. Am. Counterclaim ¶¶277, 280, 306.  The record, however, shows that any illegal anti-competitive conspiracy that occurred at the Lee County auction took place on the fourth or fifth day, *not* during the first three days.  Coast, however, included that prepositional phrase, which had the effect of limiting the scope of its allegations, in both the original counterclaim and the amended counterclaim [D.E. 214].  In light of the inclusion of the limiting language in the amended counterclaim, Gulf Group argues that Coast cannot succeed on its indemnification claim as a matter of law because there is zero evidence in the record with which to argue that any illegal conspiracy took place during those first three days.  Gulf Group concedes that if that limiting language was not included in the counterclaim then an issue of fact may exist as to whether the conduct that occurred on days four and five of the Lee County auction could support a claim that Gulf Group was obligated to indemnify Coast for its settlement of the Attorney General's investigation.

Gulf Group's argument is based upon the simple proposition that Coast is bound by the allegations in its counterclaim and may not at this stage change "its theory of when Gulf [Group] allegedly engaged in illegal conduct at the 1998 Lee County auction." Mot. Sum. Judg., at 9 n. 3. The argument has some facial appeal, but a review of the entire record in this case points in a very different direction.

During a deposition taken during discovery in this case, Claudia Santoyo (one of Gulf Group's bidders at the 1998 Lee County auction) admitted that, on the fourth day of bidding, she and another bidder decided to acquiesce in other bidders' anti-competitive conduct. Haveles Aff., Ex. 16, at 121. She stated: "We didn't agree to bid at 18 percent. . . . It was just we thought that's what we should do to keep the general feeling okay . . . ." *Id.* Although a very good common-sense argument can be made that Coast should have moved for leave to amend its counterclaim, at the very latest, once it discovered evidence that Gulf Group engaged in anti-competitive conduct on the fourth and fifth days of the bidding at the 1998 Lee County auction, its failure to do so will not prove fatal under the circumstances involved in this case.

As Gulf Group points out, pleading is vitally important to inform the opposing party of the grounds upon which a claim rests. A "complaint is adequate only if it 'fairly notifies a defendant of matters sought to be litigated[.]'" *Conner v. Illinois Dep't. of Natural Res.*, 413 F.3d 675, 679 (7th Cir. 2005). The problem with Gulf Group's position is that, despite the counterclaim's narrow factual allegations, Gulf Group otherwise had ample notice of Coast's broader claim. This is not a case where an entirely new claim is being asserted at the last minute; rather, Coast pled the claim too narrowly by limiting it to the first three days of the 1998 Lee County auction. Gulf Group cannot claim, however, that it was unaware of what transpired at the bidding after the first three days as it has been fully aware of Ms. Santoyo's sworn testimony since at least February 25, 1999.

Given Gulf Group's knowledge of Ms. Santoyo's testimony, its production of that testimony to Coast, Coast's subsequent questioning of Ms. Santoyo at deposition regarding that testimony, and Gulf Group's acknowledgment in its response to Coast's Fifth Motion to Compel Production that Coast was alleging that Gulf Group had engaged in a conspiracy to engage in anti-competitive conduct during days four and five of the 1998 Lee County auction, the Court finds that Gulf Group had fair and repeated notice that Coast's indemnification claim had been broadened after discovery to include days four and five of the auction.  A party armed with that knowledge should not benefit, to Coast's detriment and contrary to the ends of justice, from Coast's counsel's overlooking how narrowly the indemnification claim had been pled in the counterclaim.  The practical reality is that Gulf Group has been aware of Ms. Santoyo's testimony and its potential indemnification liability to Coast since the inception of this lawsuit and should have,  and indeed has, been preparing its defense accordingly.

Gulf Group cites *Avirgan v. Hull*, 691 F. Supp. 1357, 1360 (S.D. Fla. 1988), for the proposition that "[p]laintiffs are bound by the allegations of their complaint."  The facts in *Avirgan*, however, are simply not analogous to the facts here.  In *Avirgan*, the plaintiffs alleged  that a conspiracy began in May 1983, and the court, based on those allegations, limited  discovery from December 1982 to November 1986.  On defendant's motion for summary judgment, the court rejected the plaintiffs' assertion that they should have been allowed to conduct discovery concerning activities prior to December 1982, holding that the plaintiffs were bound by their earlier allegations and observed that they had not otherwise been able to uncover any evidence of a conspiracy during discovery.  *Id.* at 1360-61.

By contrast, all parties were aware that Coast had discovered evidence that Gulf Group engaged in  anti-competitive conduct at the  1998 Lee County auction.

Furthermore, Coast is not asking the Court to allow it to conduct more discovery in a last-minute effort to uncover evidence of Gulf Group's wrongdoing. Coast already has that evidence. Gulf Group's position, which is admittedly legally defensible, serves to raise a purely procedural and hyper-technical obstacle to avoid potential indemnification liability. The Court recognizes, of course, that procedural missteps may be significant and have consequences in litigation. Nonetheless, in a case such as this one, where the opposing party has not suffered prejudice, the Court has discretion to allow Coast to broaden its claim from "the first three days" of bidding at the 1998 Lee County auction to include days four and five. *See Forbus v. Sears Roebuck & Co.*, 30 F.3d 1402, 1405 (11th Cir. 1994) ("District courts have broad discretion to grant or deny leave to amend."); *Jameson v. Arrow Co.*, 75 F.3d 1528, 1534 (11th Cir. 1996) ("The decision whether to grant leave to amend is within the sound discretion of the trial court."). Analogously, the Eleventh Circuit has found that courts do not abuse their discretion when they grant leave to amend in cases where the opposing party was on notice of an intended affirmative defense. *Forbus*, 30 F.3d at 1405. This reasoning surely applies with equal force to intended counterclaims that are broader than the specific language used in the pleadings and of which the opposing party has full knowledge and understanding.[3]

---

[3] Fed. R. Civ. P. 15(b) also instructs the Court that, when evidence is objected to at trial on the basis that it is outside the issues framed by the pleadings, leave to amend the pleadings shall be freely granted if not allowing the amendment would cause the presentation of the merits of the action to be subserved and the objecting party does not satisfy the Court that the admission of the evidence will prejudice the party. Although Rule 15(b) is not directly applicable on summary judgment, it contemplates the resolution of the analogous issue raised here. If the rules would allow the amendment of pleadings at trial when the objecting party is not prejudiced and the amendment would facilitate resolution of the case on its merits, it seems appropriate to allow such an amendment on summary judgment, especially where the amendment does not raise an entirely new claim, but merely broadens its parameters in the pleadings. *See Rodriguez v. Ritchey*, 556 F.2d 1185, 1190 n.14 (5th Cir. 1977) (". . . it could be advanced that, where a case is in summary judgment posture, the allegations of the complaint and answer should be deemed amended to conform to the proof under [Rule] 15(b) before a court determines

Procedural rules are designed to assist in case management and to prevent prejudice to litigants, not to provide avenues for a litigant to escape liability on the basis of opposing counsel's technical misstep.  Gulf Group has been aware of Ms. Santoyo's testimony from the inception of this litigation and has even acknowledged Coast's assertion during the course of this litigation that Gulf Group engaged in illegal conduct during the fourth and fifth days of bidding at the 1998 Lee County auction.  Its claim that it blindly limited its discovery to the first three days of the bidding based on the allegations in Coast's counterclaim is not supported by the record.  The Court will not grant summary judgment in Gulf Group's favor on the indemnification counterclaim based upon such an argument.  *See Foman v. Davis,* 371 U.S. 178 , 181-82 (1962) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

### 3.   *Substantive Argument as to Effect of 2002 Release*

As Gulf Group's procedural argument will not be sufficient for the Court to grant summary judgment on the indemnification claim, we will turn to Gulf Group's assertion that its ninth affirmative defense bars Coast's indemnification counterclaim.  That defense is premised on a release agreement negotiated and executed by the parties in February 2002.  The release reads, in pertinent part, as follows:

> Coast acknowledges that Gulf [Group] has fully and satisfactorily performed all aspects of its contractual relationship with Coast to date.  Other than with respect to continuing activities and obligations under the Gulf Agreement and any acts intentionally concealed from Coast, Coast releases Gulf from any and all claims that it has or may have had that any action or alleged inaction on the part of Gulf has in any way adversely affected the portfolio or its return.

whether to grant judgment.").

To determine whether this affirmative defense bars Coast's indemnification claim as a matter of law, the Court must construe the release in accordance with general principles of Florida contract law. *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1103 (5th Cir. Unit B 1981); *Florida Educ. Ass'n, Inc. v. Atkinson,* 481 F.2d 662, 663 (5th Cir. 1973). Where the language of a contract is unambiguous and not subject to conflicting inferences, construction of the contract is a question of law for the court, not a question of fact for the jury. *Friedman v. Virginia Metal Prod. Corp.,* 56 So. 2d 515, 516 (Fla. 1952); *Weingart,* 654 F.2d at 1103. In construing a release agreement, the court must look first to the intent of the parties as expressed in the document itself and, where that intent can be ascertained from the unambiguous language of the instrument, construction of the document is a question of law for the court, not a question of fact for the jury. *See Atlantic Coast Line R.R. Co. v. Boone,* 85 So. 2d 834, 842 (Fla. 1956).

The principal argument Coast raises in its brief against summary judgment on the release is that the plain language of the release specifically excludes "acts intentionally concealed." Coast maintains that whether or not Gulf Group intentionally concealed the circumstances underlying the 1998 Lee County Auction is an issue of fact for the jury to consider. Gulf Group, however, proffers sworn and unrebutted evidence that the details of what happened at the auction – which are found in the Santoyo's 1990 sworn statement taken by the Attorney General's investigators – were provided or made available to Coast's lawyers in November 2000. Therefore, Gulf Group argues that no genuine issue of fact can exist as to its intentional concealment of the circumstances surrounding the Lee County auction.

With respect to this issue, Coast is in the awkward position of having to prove that it had evidence of Gulf Group's actual liability at the time that Coast settled with the Florida Attorney General in 2002 at the same time as Gulf Group was intentionally

concealing its wrongdoing from Coast.  It is difficult to prove both.  The evidence of actual liability that an indemnitee must possess to bind the indemnitor to a settlement agreement reached without notice to the indemnitee must be evidence obtained at the time that the indemnitee settled the underlying action.  *GAB Bus. Serv., Inc. v. Syndicate*, 809 F.2d at 761 ("there is placed on [the indemnitee] the burden of justifying his payment of damages to the person who sued him, *by offering against the defendant in the second suit practically the same evidence as was relied on to establish the case against him, the plaintiff, when he was defending the first suit.*") (citing *Hull & Co. v. McGetrick*, 414 So. 2d 243, 245 (Fla. 3d DCA 1982)) (emphasis in original).

Accordingly, the Court was initially inclined to find that Coast does not have any evidence that Gulf Group intentionally concealed evidence of its wrongdoing at the 1998 Lee County auction and that the parties' indemnification agreement releases Gulf Group from liability for Coast's settlement of the Florida Attorney General action.  Upon more thorough review of the release and the record, however, it appears that we were ignoring a critical fact: a genuine issue of fact exists as to whether the release covers at all the conduct underlying Coast's indemnification claim.  Gulf Group, as the movant, bears the burden of showing that the release unambiguously bars Coast's claim as a matter of law, which it has failed to do.  Admittedly, Coast's briefing did not seem to take much issue with this important element of the argument, focusing instead on the minutiae of the argument surrounding the intentional concealment issue.  Coast may be able to overlook the forest for the trees, but the Court does not have that luxury at the summary judgment stage of a case.

The operative language of the release is found in only one paragraph of a two-page document, which the parties entered into in February 2002.  There is no dispute that the impetus for entering into this release was *not* the Attorney General's investigation – for,

if it had, one would likely have seen some mention of that investigation on the face of the document.  Instead, the reason that the release was entered into was that Coast was in the midst of an arbitration with a third party (unrelated to the Attorney General investigation) and needed Gulf Group's cooperation in that proceeding.  Gulf Group refused to cooperate with Coast unless Coast signed an indemnification and release of Gulf Group.  The document was then prepared, which indemnified Gulf Group from any liability that it may suffer from the third party in connection with that proceeding.  And only one paragraph of the document related to the release by Coast of any damage claim against Gulf Group.

The Court finds that the release does not unambiguously cover the conduct underlying Coast's indemnification claim, at least for summary judgment purposes.  First, the release only appears to cover actions arising from the parties' contractual relationship and fails to include the broader language usually found in enforceable releases that operate to bar current or future third party claims.  For example, the release enforced in *Perfumania Holding Corp. v. XL/Datacomp*, 605 So. 2d 976, 977 (Fla. 3d DCA 1992), provides that it applied to all claims that either party might have "by reason of any matter . . . whatsoever arising from or relating to the [previous computer purchase] Agreements . . . ."  By contrast, the language used in this release applies to any and all claims that Coast "has or may have had" against Gulf Group.  There is no reference at all in the release as to how the release would affect any third party claims.

Second, neither party has argued whether or not Gulf Group's alleged anti-competitive bidding at the 1998 Lee County auction adversely affected Coast's portfolio or its return.  The language of the release is very specific in this respect.  One simply cannot tell from the face of the release whether the financial ramifications of an ongoing Attorney General investigation could be deemed to affect the "portfolio or its return."

Perhaps one should read this language in the release as implying any and all financial or monetary impact, including consequential damages, special damages, fines, settlements, assessment, penalties, of any kind.  Or perhaps one could read the language as limited only to actions or inactions by Gulf Group that directly impacted the book value of the investments in the portfolio.  In the former case, a settlement with a governmental authority may be covered, while in the latter case such a settlement may be beyond the four corners of the release language.  The bottom line is that the language used in this release is neither clear, unambiguous, or definite enough to be construed as a matter of law.

Third, and most troubling for summary judgment purposes, is the fact that the release does not appear to contemplate future actions; rather, it is limited to past activities.  The limitations of this release language become quite apparent when one again compares these provisions to the release in *Perfumania*.  In *Perfumania*, the release covered all claims which either party "had, now have, or hereafter can or may have . . ." *Id.* at 977.  The release in *V & M Erectors, Inc. v. Middlesex Corp.*, 867 So. 2d 1252 (Fla. 4th DCA 2004), similarly makes clear that prospective conduct is covered.  It states: "HEREBY . . . releases . . . said second parties of and from any and all manner of action . . . known or unknown, which said first party ever had, now have [sic], hereafter can, shall or may have, against said second parties . . . ." *Id.* at 1254.  By contrast, the release here does not mention future conduct and it clearly excludes any "continuing activities."

This issue is particularly important because the release was signed *before* Coast's cause of action for indemnification accrued.  A claim for indemnification does not accrue until the time of payment of the underlying claim, payment of a judgment thereon, or payment of a settlement thereof by the party seeking indemnity.  *McKenzie Tank Lines, Inc. v. Empire Gas Corp.*, 538 So. 2d 482, 486 (Fla. 1st DCA 1989).  At the same time, a

release under Florida law "cannot affect a claim that has not yet matured." *Xanadu of Cocoa Beach Inc. v. Zetley,* 822 F.2d 982, 986 (11th Cir. 1987 ) (citing *Ciliberti v. Ciliberti,* 416 So. 2d 48 (Fla. 3d DCA 1982)).   Specifically, Florida law clearly provides that a "general release which is not restricted by its terms to particular claims or demands. . . will ordinarily be regarded as embracing all claims or demands which had matured at the time of its execution." *Sottile v. Gaines Constr. Co.,* 281 So. 2d 558, 561 (Fla. 3d DCA 1973).

Therefore, the release arguably cannot bar Coast's indemnification claim.  In order to grant Gulf Group's motion for summary judgment with respect to Coast's indemnification claim, the Court would have to make a finding as a matter of law that the release squarely covers the conduct underlying the indemnification claim that accrued after the date of the release.  On these facts, the Court is unable to make such a finding, just as in *Xanadu* where the Eleventh Circuit reversed a judgment that barred a fraud claim based on prior execution of a general release because the "the fraud claim could not have accrued until after the release was signed.  A release cannot affect a claim that has not yet matured."  822 F.2d at 986.

The parties could have, of course, drafted a far broader and more detailed release, like those cited above, that squarely applied to the Attorney General's investigation by name or to any future claims or demands from any third parties, known or unknown at the time the release was executed.  The problem for Gulf Group here is that these provisions are missing from this release.  Perhaps, of course, all parties who participated in the drafting and execution of the release contemplated that the release would also apply to the pending Attorney General investigation, and merely drafted the language in a matter-of-fact manner because it was so obvious to everyone.  In that case, the trier of fact should find that the parties' release should bar this indemnification claim.

Or, on the other hand, perhaps one party intended to bring the investigation within the scope of the release while the other party was focused on other things.  The trier of fact may reach a different result, as evidence adduced at trial may bear out one side or the other.  But faced with the issues being addressed here, and based on the paper record that is before the Court, we have no choice but to conclude that summary judgment is not the proper vehicle for disposition of the indemnification claim.  "The intent of the parties regarding that issue is a factual dispute and thus is a question to be determined by a jury." *Weingart,* 654 F.2d at 1104 (reversing judgment as a matter of law that release barred claim because fact issue existed as to whether parties intended to include certain types of claims within the scope of the release).  Accordingly, judgment will not be entered against Coast's fourth counterclaim or with respect to Coast's related fifth and sixth affirmative defenses raised in answer to Gulf Group's breach of contract.[4]

### C.     *Fifth Counterclaim - Injury to Professional Reputation*

Finally, Gulf Group contends that it is entitled to summary judgment on Coast's fifth counterclaim for injury to professional reputation.  It reminds the Court that Coast has already conceded that no such claim exists under Florida law, but that Coast argues that California law applies to the claim.  It further points out that this Court has already determined that there is no agency relationship between Coast and Gulf Group and that Coast has previously stated that the claim is one for breach of a duty owed by an agent to its principal.

---

[4]     Again, the Court is mindful of the potentially excess time that may be consumed at trial on this issue, which even if 100% successful will yield "peanuts" (in Judge Klein's words) when compared to Gulf Group's breach of contract claim.  Peanuts or not, however, it is also important to remember that an erroneously entered summary judgment may yield even more unnecessary time and expense on appeal.  The Court must take that into consideration as well.  Gulf Group, of course, remains free to stipulate to the amount of the indemnification claim as a setoff against its own claim.

In response, Coast argues that California law must apply to the claim because Florida does not recognize a claim for injury to reputation.  It then argues that an agency relationship is not necessary, citing *Kippen v. American Automatic Typewriter Co.*, 324 F.2d 742 (9th Cir. 1963) for that proposition.

First, Coast's reliance on *Kippen* is suspect.  The Court notes that the court in *Kippen* dealt with a distributorship contract.  Further, that court expressly stated that the decisions it considered in making its determination treated "comparable distributorship contracts, at least in part, as agency contracts."  *Id.* at 744 (citing *Hunt Foods, Inc. v. Phillips*, 248 F.2d 23 (9th Cir. 1957), *Kelly-Springfield Tire Co. v. Bobo*, 4 F.2d 71 (9th Cir. 1925), and *Jack's Cookie Co. v. Brooks*, 227 F.2d 935 (4th Cir. 1955)).  The court also opined that, in light of the duties that the distributor was expected to perform, the existence and scope of an implied condition not to consume liquor would be the same whether the relationship between the parties was characterized as that of independent contractor, agent or employee.  The problem with analogizing *Kippen* to the present case, however, is that this case does not deal with a distributorship contract, which *Kippen* finds is usually treated as an agency contract.  The contract here deals with the purchasing of tax lien certificates, which Judge Jordan found as a matter of law was not an agency contract.

Second, California law does not automatically apply to this claim merely because Florida law does not recognize the cause of action.  Rather, a choice of law analysis must be conducted to determine which state's law applies to the claim.  Federal courts sitting in diversity apply the choice of law rules of the forum state.  *See Klaxton v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Florida, the forum state in this diversity action, follows the "significant relationship test" to resolve choice of law conflicts for tort claims.  *See Trumpet Vine Invs., N.V. v. Union Capital Partners*, 92 F.3d 1110, 1115-16 (11th Cir.

1996); *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  Under this

test, the rights and liabilities of the parties in a tort action are determined by the local law

of the state which has the most significant relationship to the occurrence and the parties.

*See id.*  Factors to consider in making this determination include: (1) the place where the

injury occurred; (2) the place where the conduct causing the injury occurred; (3) the

domicile, place of incorporation and place of business the parties; and (4) the place where

the parties' relationship is centered.  *See id.* These contacts are to be evaluated according

to their relative importance with respect to the particular issue.  *Id.*  If two or more states

are interested, then the court must determine which state has a dominant interest and

apply the law of the state.  *See Tune v. Philip Morris Inc.*, 766 So. 2d 350, 354 (Fla. 2d DCA

2000).  Furthermore, under a choice of law inquiry, "[e]ach issue is to receive separate

consideration if it is one which would be resolved differently under the local rule of two

or more of the potentially interested states."  *See Judge v. American Motors Corp.*, 908

F.2d 1565, 1571 n.6 (11th Cir. 1990) (quoting Restatement (Second) Torts § 145,

comment d).

　　　　The alleged injury arising from Gulf's alleged breach of contract arguably occurred

in California, as Coast's primary offices are located in Santa Monica, California.  Whether

the state where the injury occurred is the decisive factor in a choice of law analysis

depends upon the particular facts and circumstances.  *See Judge*, 908 F.2d at 1568

(citing *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980)).  Here, Coast

alleges that Gulf's negligence, breach of fiduciary duty, and illegal conduct led to its

respective injuries under the second, third, and fifth counterclaims.  Because Gulf's

administration of its duties under the service agreement – as well as its alleged breach of

those duties – took place in Florida, the activities giving rise to the injury occurred in

Florida.  Under these circumstances, the locus of the injury is less relevant than the locus of the tortious conduct.

Under the third factor, Gulf is a Florida corporation doing business in Florida with its primary offices in Miami-Dade County, Florida, *see* Complaint at ¶1, and Coast is a Delaware limited partnership with its principal place of business in Santa Monica, California, *see* Answer and Counterclaims at ¶ 75.

Finally, the parties' relationship is centered in Florida.  Their service agreement provided for Gulf to acquire tax certificates at public auctions throughout Florida and to service and administer those tax certificates.  Moreover, the service agreement sets forth that it "shall be governed by and construed in accordance with the laws of the State of Florida without reference to its conflict of laws provisions . . . [and] that the venue for any claim arising out of this Agreement shall be in Miami, Miami-Dade County, Florida."  *See* Service Agreement at ¶ 13(f).  Thus, the parties themselves chose Florida as the state whose law governs the agreement.  *See Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1116 (11th Cir. 1996) (finding that New York law governed due in part to the parties choice of New York law in their agreement).[5]

This Court previously weighed these factors in its Order on Motion to Dismiss Counterclaims [D.E. 175] and concluded that Florida has the most significant relationship to the litigation and the parties; namely, the service agreement centers on the purchase and administration of tax certificates in the state of Florida.  The conduct by Gulf Group alleged to have led to Coast's tort injuries occurred in Florida.  The only connection of the

---

[5]     Moreover, this forum selection clause in the service agreement may also cover tort claims.  The Eleventh Circuit in *Stewart Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987), found that a forum selection clause referring to "*any* 'case or controversy arising under or in connection" with the parties' agreement includes all causes of action arising directly or indirectly from the business relationship evidenced by the contract, including tort claims.  (emphasis in original).

parties and claims to California is that Coast's principal place of business is in Santa Monica.  Furthermore, Coast has not pointed to evidence in the record that supports its position that California law should be applied to a claim for injury to reputation.  The Court has reviewed the record and has not found any evidence contrary to the choice of law analysis undertaken by this Court in its Order on Motion to Dismiss Counterclaims, which is set forth above.

Although Coast did not raise the issue of a false conflict with respect to this claim in its response to Gulf Group's motion for summary judgment, it did do so in response to Gulf Group's motion to dismiss.  The Court will now revisit that issue in connection with Gulf Group's motion for summary judgment.   A false conflict exists in the following three circumstances: (1) when the laws of different states are the same, (2) when the laws of different states are different but would produce the same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws.  *See Tune v. Philip Morris Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000) (citing *Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12, 14 (D.D.C. 1997)).

Coast argues that the policies of California would be furthered by the application of its laws while the policies of Florida would not be advanced by the application of Florida law.  We disagree.  From the outset, the Court notes that the parties' relationship was created in Florida as the parties' contract was governed by Florida law and that Gulf Group's work was conducted in Florida.  California, therefore, should not have a greater interest in this case than Florida.  As such, a false conflict does not exist here.  Applying California law to this claim would not further the policies of California concerning injury to reputation claims.  The Court finds that Florida law should be applied to this claim and that this cause of action is not recognized under Florida law.  Accordingly, the Court

grants Gulf Group's motion for summary judgment with respect to Coast's injury to reputation counterclaim.

### IV. CONCLUSION

It is hereby **ORDERED AND ADJUDGED** that Counter-Defendant's Motion for Summary Judgment [D.E. 384] is **DENIED IN PART AND GRANTED IN PART**.

1.  The motion is **GRANTED** as to Counter-plaintiff's First Counterclaim to the extent that it concerns paragraph 3(d) of the parties' agreement and it is **DENIED** to the extent that it concerns paragraphs 4 and 5.  Partial Summary Judgment for Counter-Defendant on the First Counterclaim shall be entered at a later date.

2.  The motion is **GRANTED** as to Defendants' Third and Fourth Affirmative Defenses to the extent they concern paragraph 3(d) of the parties' agreement and it is **DENIED** to the extent that they concern paragraphs 4 and 5.  Partial Summary Judgment for Plaintiff on these affirmative defenses shall be entered at a later date.

3.  The motion is **DENIED** as to Defendants' Seventh and Eighth Affirmative Defenses as the Court finds that they relate only to paragraphs 4 and 5 of the parties' agreement.

4.  The motion is **DENIED** as to Counter-plaintiff's Fourth Counterclaim for Indemnification.

5.  The motion is **DENIED** as to Defendants' Fifth and Sixth Affirmative Defenses.

6.  The motion is **GRANTED** as to Counter-plaintiff's Fifth Counterclaim for "Injury to Reputation."   Summary Judgment for Counter-Defendant on the Fifth Counterclaim shall be entered at a later date.

**DONE AND ORDERED** at Miami, Florida, this 13th day of February, 2007.

EDWIN G. TORRES
United States Magistrate Judge